prejudicial to the defendants, and must have had some influence upon the minds of the jurors, inducing them to convict; but it is obvious that the remarks objected to were not in disparagement of the defendants, but, rather, of Scafane, the witness for the people, and, if they tended to discredit anybody, it was that witness. Scafane testified to the occurrence, and on cross-examination he was asked by the counsel for the defendants whether he ever carried a knife or a pistol, not whether he carried a knife or pistol on the occasion of the affray under consideration. The court thereupon made the observation:

"Do you not think that the court will take judicial notice that there never was an Italian who did not carry a knife or pistol? Well, I would not say that, because I have no right to do it; but I mean by that, is it worth while to ask these Italians whether they carry a knife or pistol? He would probably say 'No.'"

There was no exception taken to the refusal of the court to allow this question to be answered, but the intimation of the court reflected upon the people's witness. It had no relation whatever to anybody else at that time. It certainly could not have prejudiced the defendants any more than the only witness upon which the prosecution relied. The remark may have been unwise and unseemly, but it passed as one of a casual character, to which no importance was attached by the counsel who tried the case for the defendants; and so with regard to the questions as to the complainant having been convicted of murder in Italy. If they had been considered of any consequence, the defendants' counsel would certainly have caused a proper entry of their objection to be made upon the record.

The judgment should be affirmed. All concur.

---

(73 App. Div. 559.)

## In re HOPKINS' WILL.

(Supreme Court, Appellate Division, Second Department. June 6, 1902.)

1. WILLS—REVOCATION—CANCELLATION OF SIGNATURE—EVIDENCE.
    Evidence considered, and *held* not to show that certain lines drawn through testator's will were made by him so as to render it nugatory under Banks & Bros.' Rev. St. (9th Ed.) p. 1878, § 42, declaring a will may be revoked by cancellation or obliteration with revocative intent by the testator himself.

2. SAME—TESTIMONY—TESTATOR'S DECLARATIONS—BELIEF IN TESTACY.
    On an issue whether a will was revoked by the testator, testimony as to his declarations subsequent to the will tending to show that nearly to the time of his death he believed himself testate was incompetent.

3. SAME—HARMLESS ERROR.
    Code Civ. Proc. § 2545, provides no decree shall be reversed for error in admitting or rejecting evidence unless it appears that the ruling was necessarily prejudicial. On an issue whether a will had been revoked, certain incompetent testimony was admitted over objection, the surrogate reserving his decision, but was subsequently struck out, the surrogate stating that he gave it no consideration. *Held* that, whether or not it was error not to exclude the testimony when objected to, there would be no reversal of a decree for proponent, it appearing it was proper independent of such testimony.

4. SAME—COMPARISON OF WRITINGS—EXPERT TESTIMONY—STATUTES—CANCEL-
ING MARKS.

Laws 1880, c. 36, and Laws 1888, c. 555, permit the comparison of a disputed writing with any writing proved to the satisfaction of the court to be genuine. Held, that testimony of an expert that lines drawn through the signature to a will were not made by the testator was competent, the word "writing" in the statutes including the marks.

5. SAME—PRIVILEGED COMMUNICATIONS—PHYSICIAN'S TESTIMONY—WAIVER OF PRIVILEGE.

Code Civ. Proc. § 834, prohibits a physician from testifying to matters coming to his knowledge in a professional capacity, and which were necessary to enable him to act. Section 83 provides a physician may disclose any information as to the mental or physical condition of a deceased patient, etc., when the validity of the patient's will is in question and the provisions of section 834 have been waived by the executor or husband, widow, or any heir at law or any next of kin or other party in interest. Held that, when the issue was as to whether a will had been revoked by testator, the "validity of the will" was in question, within the statute.

6. SAME—WAIVER BY EXECUTOR OR HEIR.

It is not necessary to a waiver of section 834 that the executor, widow, and heir should join therein, but either or any may do so.

Woodward and Jenks, JJ., dissenting.

Appeal from surrogate's court, Westchester county.

In the matter of the last will of Robert E. Hopkins. From an order of the surrogate (72 N. Y. Supp. 415) admitting to probate a paper propounded as the last will of Robert E. Hopkins, Robert E. Hopkins, Jr., appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Joseph W. Middlebrook, for appellant.

Clarence S. Davison, for respondents Hopkins and Jameson.

H. C. Henderson, for respondent Hopkins.

James MacGregor Smith, for respondents American Board of Com'rs for Foreign Missions and Congregational Home Missionary Soc.

Ernest I. Edgcomb, for respondents Pompey Congregational Church and others.

GOODRICH, P. J. Robert E. Hopkins duly executed his last will in November, 1891, with all the attendant formalities prescribed by the statutes of this state. He died on May 9, 1901. On May 15th the will was offered for probate to the surrogate's court of the county of Westchester. At this time there were certain vertical lines upon the signature. If these were made by the testator with intent or for the purpose of revoking the will, and the fact of such destruction had been proved by two witnesses, the surrogate would have been required to refuse probate. He admitted the will to probate, and this appeal from his decree is taken by the infant son of the testator, through his special guardian, who contends: First, that incompetent evidence was received; second, that the surrogate erred in reserving his ruling upon the admissibility of evidence objected to as incompetent; third, that his findings upon the facts

proved are against the laws of evidence and are inconsistent; and, fourth, that his findings are against the weight of evidence.

The testator left, him surviving, his widow, Frances W. Hopkins, and his son, Robert E. Hopkins, an infant about 13 years of age, his only heir at law. The provisions of the will have an important bearing in ascertaining the character, intentions, and purposes of the testator. He devised to his widow his family residence and some other real estate at Tarrytown, the household and stable furniture, and the sum of $250,000, all this in lieu of dower. He bequeathed to his son $100,000. He devised to Mrs. Upson, his sister, a house in Syracuse, and provided a trust fund of $25,000, the income of which was to be paid to her during life; and at her death the fund was to be paid to certain benevolent institutions in Syracuse. He bequeathed to a cousin, Miss Harper, $5,000; to Miss Kernochan, the daughter of an old friend, $1,000; to his sister-in-law Miss Mary B. Chambers, $5,000 in railroad bonds; to his sister-in-law Miss Helen T. Chambers, $1,000; to Robert D. Benson, son of his partner, $1,000 in stock; to the academy at Pompey Hill, Onondaga county, $3,000; to the Congregational church in the same town, $3,000; to the trustees or officers of the Old Cemetery, in the same town, $3,000; to the First Presbyterian Church of Titusville, Pa., $10,000; to a former waiter, $500; to Alexander Chambers, Jr., his watch and chain; to Mr. Dane, his diamond stud; to the American Board of Commissioners for Foreign Missions and to the American Home Missionary Society, each $10,000. He gave the residue of his property, two-thirds to his widow and one-third to his son. He carefully provided that, if his estate was insufficient for all the sums of money bequeathed, each bequest should be proportionately diminished, and directed that no bequest should be enforceable for three years. He named his widow and his friend, David McKelvy, his executors, giving full powers. I have detailed these testamentary provisions because the will shows the testator to have been an intelligent man, desiring, intending, and careful to provide primarily for his widow and child, and, secondly for legacies to institutions and benevolent organizations and to relatives and friends more or less dependent upon him, and with whom his relations were pleasant and, as shown by the evidence, continued to be so up to the time of his death. The will was drawn by his intimate friend and partner, Mr. McKelvy, who remained until the testator's death his intimate business associate.

Mr. Hopkins was born at Pompey, in Onondaga county. He made bequests to the academy, the church, and the cemetery association of that town, and to benevolent institutions at Syracuse, in the county of his birth. He had been connected in business relations with Benson and McKelvey at Titusville, each of whom was remembered; and he made a bequest to a church in Titusville. He also made substantial bequests to three missionary societies. He provided for relatives and friends, and the remainder of his property he gave to his widow and child. In all this he evinced the careful habits of a man who knew what he wanted to do and did it. He evidently knew, or was advised by his counsel, who drew the .

will, how a will should be executed. We are now asked to believe that this intelligent, painstaking, and discriminating will maker canceled his will by making with a pen vertical strokes upon the signature, not in the presence of witnesses nor with the formalities provided by the statute; and that, without making a new will or leaving any written explanation of his intention so to do or his reasons for doing it. No suggestion of any cause or reason for any change of his testamentary intentions appears in the record. On the contrary, it is in evidence and not disputed that his relations with his wife and child and his relatives and friends named in the will continued to be of an affectionate character, without any estrangement or change, up to the time of his decease. On May 6th, his wife accompanied him on a trip to Philadelphia. They spent the nights of May 6th and 7th at Newtown, near that city, and returned to their home in Tarrytown on the 8th. On the 9th he died suddenly of apoplexy. The following quotations are from the testimony:

"He was a large-minded public citizen, * * * a man of large mind and generous nature, * * * a man with a good deal of sentiment. * * * Persons he liked or anything of that kind he was very fond of; * * * a strong character, very strong. * * * At the time of his death * * * he was about sixty-eight. Major Hopkins was a good business man; very careful. He was systematic; he was a very careful, methodical, business man, and kept his business matters in good shape."

The record discloses no evidence whatever of any desire, on his part, either to cancel his will or to make any changes in its provisions, except such as could be inferred from a conclusion that the canceling marks were made by himself. Can it be presumed that a man of this character—careful, systematic, methodical in his business, familiar with business affairs—would cancel a well-considered, reasonable will, where no change of conditions is shown; would cancel such a will by an act so utterly informal as is shown by the appearance of the will? In the case of Sugden v. Lord St. Leonards, 1 Prob. Div. 154, made famous partially because it involved the will of a former lord chancellor of England, Sir James Hannon, in considering the question of the revocation of a will, used language which is singularly apposite to the case at bar, when he said (page 176):

"It is obvious that where a will, shown to have been in the custody of a testator, is missing at the time of his death, the question whether it is probable that he destroyed it must depend largely upon what was contained in the instrument. Was it one arrived at after mature deliberation? Did it deal with the interests of the whole of his family, carefully arranging the dispositions which he would make in favor of the several members of it; or was it the hasty expression of a passing dissatisfaction with some one or more of them? These are questions naturally having the strongest possible bearing upon the ultimate question which I may have to determine,—namely, whether or not the testator himself destroyed this instrument."

We come now to the consideration of the provisions of the Revised Statutes (2 Banks & Bros.' Rev. St. [9th Ed.] p. 1878), which read as follows:

"Section 42. No will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked, or altered, otherwise than by some other will in writing, or some other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which

the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person in his presence, by his direction and consent; and when so done by another person, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses."

Here is a careful guard against the fraudulent destruction of wills. Its prohibitory language is stronger than affirmative language would be. "No will," says the statute, "shall be revoked," except by the following methods: First, by some other will in writing; second, by some other writing declaring such revocation, executed with the same formalities required for the execution of the will itself; third, cancellation, obliteration, or destruction, with the intent and for the purpose of revoking the same, by the testator himself; or, fourth, by another person in the presence of the testator, and by his direction and consent; this to be proved by two witnesses. The first, second, and fourth of these methods may easily be eliminated from our consideration, as there is not a particle of evidence upon which such a revocation could be based. The third method requires evidence of the cancellation, obliteration, or destruction by the testator, with intent or for purpose of revocation. The only evidence on this subject is such as may be inferred from the production of the will itself with the canceled signature. All the probabilities derived from the circumstances are against the proposition that this was the act of the testator; such as the execution of a will suitable to the circumstances of the testator and his family, its existence for 10 years, its production before the surrogate, as executed by the testator, undestroyed and without any change in its condition except the marks over the signature. It would have been easy for the testator, who had been advised by his physician that he was liable to sudden death, if he had desired to change any of its provisions, to have made a codicil or an entirely new will; and his means were ample to secure professional assistance for the purpose. Mr. McKelvy, who drew it, was still alive; was his friend and business associate. He was named as one of the executors, and just prior to the testator's death accompanied Mr. Hopkins on a pleasure trip to California occupying several weeks. If the testator had wished to cancel the will altogether he might have destroyed it absolutely, as for instance by burning it or tearing it up. He did none of these things. Even his signature to an alteration on the first page of the will was not obliterated. Shall we on the single fact that canceling marks appear upon the signature to the will, infer that those marks were made by the testator, and also that he made them with the intent and for the purpose of revocation, where there is no other evidence whatever of such act, purpose, or intent on his part? Clearly, such a decision would fly into the face of the statute, which is intended to prevent, and not to invite and encourage, the fraudulent destruction of wills. This is not a case where a will with canceled signature was found upon the person of the deceased, or in a place of deposit to which, as in Re Clark's Will, 1 Tuck. 445, and in Re Brookman, 11 Misc. Rep. 675, 33 N. Y. Supp. 575, substantially he alone had access. In such a case a strong presumption might arise that he had himself made the canceling marks. On the other hand, there is sufficient evidence to show that the will

was not found upon his person or in his safe-deposit box; that several days after his death a very thorough search was made of his desk, to which there was general and common access, and that the will was not there at that time; and that a few hours afterward it was found there by one of Mr. Hopkins' business associates, whose integrity is unquestioned. Such facts are sufficient to destroy any presumption that the cancellation was done by the testator.

Mr. Redfield, in his treatise on The Law and Practice of Surrogates' Courts in the State of New York, says (pages 198, 199):

"To effect a revocation by destruction or cancellation of the instrument, it is essential that there should be an intention, as well as a physical act; the mere act of canceling a will is not a revocation, unless it be done animo revocandi. But a mere intention to revoke, however strongly declared, is of no effect unless carried out by some act amounting to a cancellation or revocation. The act, however, being done, the intention may be inferred from the circumstances attending the act."

In Throckmorton v. Holt, 180 U. S. 552, 21 Sup. Ct. 474, 45 L. Ed. 663, a leading case upon the question before us, Mr. Justice Peckham writing, it was held, after a careful review of English authorities, that no presumption of revocation of a will by the testator or under his direction arises from the appearance of the will when first received by the register of wills. There must be some evidence of an act by the deceased, or under his direction, sufficient to show the fact, or the instrument must have been found, among the papers of the deceased, mutilated, torn, or defaced, under such circumstances that the revocation might be presumed; and, as the production of the will created no presumption of revocation, it was necessary to prove that the act of mutilation was performed by the testator or by his direction, and with an intention to revoke. The burden of proof in this respect is upon the contestant, and the record before us is entirely barren of any such evidence. I cannot more succinctly state the facts as to the custody, search for, and finding of the will, and its condition when found, than by an extract from the opinion of the surrogate (72 N. Y. Supp. 415), premising that there is abundant evidence to support his statements:

"The proof in this case shows that Mr. Hopkins was a careful, methodical, business man. At the time of his death he was the secretary and general manager of the Tide Water Pipe Company, the office of which was at 12 Broadway, New York county, at which office he attended about twice a week. When there he occupied a roll-top desk of the company, assigned to his use, but when he was absent the desk was occupied and used by others, being left unlocked so that any one in the office could have access to it. He had a safe-deposit box in the Produce Exchange Safe Deposit Company, of New York City, in the joint names of himself and wife, and he also had a safe-deposit box at Tarrytown. He died on the 9th of May, and he was buried on the 12th. On Monday, the 13th, his widow, the proponent, accompanied by her brother, Alexander Chambers, went to New York to the office of the Tide Water Pipe Company, and there met Mr. Warren, who was connected with the company, and who had held confidential relations with the deceased and had occupied a desk in the same room with him. These three then went across the street to the Produce Exchange Safe Deposit Company's vaults and made a careful search for a will, but none was found. They then returned to the office of the Tide Water Pipe Company, and a search was made by Mr. Warren and Mr. Chambers through the company's safes, in which Mr. Hopkins sometimes put papers for safekeeping, and

through the desk in the office which had been used by him in his lifetime. No will was found. Mrs. Hopkins and her brother returned to Tarrytown that day and searched the safe-deposit box at that place, but no will was found. On the next day, Tuesday, they returned to the office of the Tide Water Pipe Company, and the same persons again examined the box in the Produce Exchange Safe-Deposit Company's vaults, with like result. They then returned to the Tide Water Pipe Company's office and searched again carefully through the desk, which was an ordinary roll-top desk with drawers on ·the right and left hand sides of the top portion, these drawers being about 15 inches long, 8 inches wide, and 2 inches deep. Every drawer was examined and every paper taken out and examined and· every envelope was opened, but no will was found, and the search was given up about one o'clock. Mrs. Hopkins returned again to Tarrytown and made another search in the box at the bank and in his private desk at home, with no better results. About three hours after Mrs. Hopkins and Mr. Chambers left the New York office, Mr. Warren went to the same desk to get a check book which belonged to a corporation in which both Mr. Hopkins and himself were interested. He opened the right-hand drawer under the roll top, and there found a blue envelope, on the outside of which were the words, 'Robert E. H.' in Major Hopkins' handwriting. Inside the envelope was the will. There were no other papers of any kind in this drawer, and the drawer was otherwise empty with the exception of a few pens and an ink eraser. On examining the will, Mr. Warren found the signature of Major Hopkins to the will canceled as already described. He read the will, and called the attention of some of the parties in the office to the fact, and on the following morning turned it over to Mrs. Hopkins in the condition in which it was found. It appears that Mr. Hopkins was a man of about 68 years of age at the time of his death.. At the ·time of the making of the will he was suffering from some tremulousness in his hands, clearly evident in his handwriting, and which increased as he grew older. We have the evidence of Mr. Carvalho, the noted handwriting expert, that in his opinion the marks canceling the signature were not made by the same hand that wrote the signature. It further appears that a year prior to his death he had been told by his physician that he had heart trouble and must be very careful; that he was liable to pass away at any time by apoplexy, and that he should get his business in proper shape, and that if he had not made a will he should do so."

It is difficult to see how, on such facts, the surrogate could have come to any different conclusion than he did in finding that "the vertical marks made with pen and ink through the signature of Robert E. Hopkins to said instrument, canceling the same, were not made by the said Robert E. Hopkins, or by his direction and consent." The conclusion of the surrogate is still further strengthened by an inspection of the signature and canceling marks upon the will, which was produced as an exhibit in this court. When he executed the will, the testator wrote his signature in two places in a trembling hand. His physician testified that in the latter years of Mr. Hopkins' life there was a gradual decline of vigor and a tremor in his hands, sometimes more marked than at others; and that there was a gradual increasing of these symptoms during the 10 years before his death. Mr. Carvalho pointed out to the surrogate the firmness of the canceling pen marks, and testified that there was no evidence of tremor in them; that they were definite, made determinedly and even viciously, and showed through and on the reverse side of the page and even upon the sheet below it; and that the marks were not made by an infirm hand. It is evident from the physical condition of Mr. Hopkins that he had no power to make any marks of that character. The inference is clear that some person other than

Mr. Hopkins made the pen marks, and, that being my conclusion, I find nothing to call upon this court to differ with the finding of the surrogate that Mr. Hopkins did not make the pen marks in question, and that the will was entitled to probate.

The special guardian strenuously contends that it was error for the surrogate to admit testimony of several witnesses, as to declarations made to them by the testator subsequently to the execution of the will, tending to show that nearly until the time of his death he believed himself testate. The evidence was admitted subject to a motion to strike it out. The court reserved decision upon that motion and the guardian excepted to this ruling.

It is settled by In re Kennedy's Will, 167 N. Y. 163, 60 N. E. 442, and Throckmorton v. Holt, supra, that such evidence was incompetent to prove that the will was in existence at the time of the testator's death. After consideration, the learned surrogate came to the same conclusion, and in his opinion he states that he has stricken out the testimony in question. But the counsel contends that the overruling of his objection, the admission of the testimony, and the reservation of decision were error which cannot be cured by striking it out. He relies especially upon four cases,—Hopkins v. Clark, 90 Hun, 4, 35 N. Y. Supp. 360, Sharpe v. Freeman, 45 N. Y. 802, Lathrop v. Bramhall, 64 N. Y. 365, and Wright v. Reusens, 133 N. Y. 298, 31 N. E. 215. I have no doubt that, if the trial had been before a jury, the reception of the testimony in the manner stated would have been reversible error, as no court could accurately determine the influence which it exercised upon the minds of the jurors; but where the trial is by a court or by a referee, without a jury, the effect is not so dangerous. See Lathrop v. Bramhall, supra. Counsel quotes the language of Mr. Justice Bradley, in Hopkins v. Clark, supra, on appeal from a judgment entered on the report of a referee, where he said (page 6, 90 Hun, and page 362, 35 N. Y. Supp.):

"This method of disposing of objections to evidence has hitherto been disapproved by the courts, and it is not allowable in practice to reserve questions arising upon objections to the introduction of evidence without consent,"—

Citing the Sharpe, Lathrop, and Wright Cases. But the learned counsel failed to add the next paragraph:

"In the present case the defendant was not prejudiced by the reservations, so far as they may be deemed made without consent. And much of the evidence to the introduction of which exceptions were taken was rendered harmless by the fact that the subjects to which such evidence related were not considered by the referee in the final determination made by him, as appears by his report."

Sharpe v. Freeman was an appeal from a judgment entered on the report of a referee. The court criticised similar practice on the part of the referee; yet it affirmed the judgment. In Lathrop v. Bramhall, where also the referee reserved his decision upon objections to the admissibility of evidence, and exception was taken, the court said that it could not be seen how the action of the referee seriously affected the defendant's interest, and that there was no

legal error justifying a reversal. The judgment was affirmed. So, in Wright v. Reusens, the court affirmed a judgment entered on the report of a referee where, without consent and under exception, he reserved his decision upon similar objections, and a motion was made to strike out the evidence. The court held that ordinarily such rulings constituted error unless the questions reserved were immaterial, or of such a character that if decided against the party raising them the decision would constitute no sufficient ground of error. The affirmance of the judgment shows that such reservation of ruling did not, in the opinion of the court, necessarily constitute error. As the surrogate subsequently decided, and in his opinion stated, that the evidence was stricken out, and not considered by him in his decision, we are brought to the question whether the failure to rule on the question of admitting the evidence when it was offered was prejudicial to the appellant, for by section 2545 of the Code of Civil Procedure a decree "shall not be reversed, for an error in admitting or rejecting evidence, unless it appears to the appellate court that the exceptant was necessarily prejudiced thereby." If this court concludes that the result reached by the surrogate might properly have been reached by him without the evidence referred to, it is at liberty to disregard the supposed error, on the ground that it could have had no influence in determining the case. If the judgment is clearly right, notwithstanding the error, it is no ground for reversal (In re Miner's Will, 146 N. Y. 121, 40 N. E. 788; Loder v. Whelpley, 111 N. Y. 247, 18 N. E. 874). In my opinion, the decree was fully sustained by the evidence. The special guardian argues with great earnestness that judges are as human as jurors, and that the minds of the former are just as much tainted and affected by incompetent evidence as the minds of the latter; that nothing reaches the mind without making its impression. Yet, with singular inconsequence, he has printed in the appeal book the objectionable testimony, though it had been stricken out, apparently without any grave fear that similar results would follow our perusal of the record.

The objection to the admission of the evidence of Dr. Coutant, the physician of Mr. Hopkins, is clearly untenable under section 836 of the Code of Civil Procedure, for the testimony did not involve any "confidential communication" made by Mr. Hopkins to Dr. Coutant. Besides, the real question was the validity of the will, and this embraces the contention that the will had been invalidated by some act of the testator subsequent to its execution; and the executors named in the will and the widow on the trial waived the professional privilege of the physician. It is not widow and heir at law and executors who must waive, but either or any of them; and here both the widow and executors did waive.

The testimony of Mr. Carvalho as to the character of the pen marks was competent. I think that the word "writing" in chapter 36 of the Laws of 1880 and in chapter 555 of the Laws of 1888 includes not only what is ordinarily and etymologically known as writing, but also such penmanship as constitutes the pen marks in question. This is in consonance with the purpose and plan of the act.

I reach the conclusion that incompetent evidence was not received

by the surrogate, that no prejudice has resulted to the contestant from the surrogate's reservation of his ruling upon the admissibility of the declarations of the testator, that his findings upon the facts proved are not against the laws of evidence or incompetent, and that his findings are not against the weight of evidence. On the contrary, I am of opinion that his decree was amply sustained by evidence, and that he could not properly have done otherwise than to admit the will to probate.

The decree of the surrogate should be affirmed, with costs to the proponent and the special guardian and to each other respondent, payable out of the estate.

BARTLETT and HIRSCHBERG, JJ., concur.

WOODWARD, J.   I dissent because I think the learned surrogate, after receiving much objectionable testimony, arrived at a determination not warranted by the evidence properly before him. He has admitted to probate a certain writing purporting to be the last will and testament of Robert E. Hopkins, deceased; but it is claimed that the testator himself revoked the will by one of the methods mentioned in the Revised Statutes (2 Banks & Bros.' Rev. St. [9th Ed.] p. 1878), to wit, by canceling.   When, after the death of the testator, the will was found, it was in a drawer in the testator's office desk; and it then appeared that the testator's signature at the end of the will had been canceled by 14 nearly perpendicular, wide, and heavy pen strokes, the ink of which had evidently not been dried with a blotter, but had been allowed to remain until it penetrated the sheet, so that the strokes were easily seen when the sheet was reversed.   Their length was somwhat greater than the height of the small letters of the signature.   If these pen strokes were made by the deceased while in his right mind, and for the purpose of revoking the will, there can be no question that we must hold the will revoked.

The Revised Statutes, supra, declare that—

"No will in writing   *   *   *   shall be revoked,   *   *   *   unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person in his presence, by his direction and consent; and when so done by another, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses."

Thus, witnesses are necessary only when the act of revocation has been done by another person than the testator and by his direction. When a will is not found at the death of the testator, the presumption is that it was destroyed by him animo revocandi (Knapp v. Knapp, 10 N. Y. 276; Collyer v. Collyer, 110 N. Y. 481, 18 N. E. 110, 6 Am. St. Rep. 405;   Minkler v. Minkler's Estate, 14 Vt. 125; Weeks v. McBeth, 14 Ala. 474); and the same presumption exists when the will is found torn (Betts v. Jackson, 6 Wend. 173; Idley v. Bowen, 11 Wend. 227).   As the surrogate says in Bulkley v. Redmond, 2 Bradf. Sur. 281, 285, "The naked fact that the will is not found raises the presumption of revocation, and that presumption

becomes conclusive unless rebutted." "But," say the court in Mink-
ler v. Minkler's Estate, supra, "we would hold this merely a natural
presumption as matter of fact, and imposing the duty upon him
who asserted the contrary to support his assertion by proof." This
rule was adopted in Betts v. Jackson, supra, and it prevails wherever
any of the mthods of revocation provided in the statute is used. Mr.
Redfield, in his Law of Wills (volume 1, § 25, subd. 8), says: "The
rule of evidence in the ecclesiastical courts, in regard to presumptive
revocations, from the absence or mutilation of the will, seems to be,
that if the will is traced into the testator's possession and custody,
and is there found mutilated, in any of the modes pointed out in
the statute for revocation, or is not found at all, it will be presumed
that the testator destroyed it, animo revocandi." To same effect,
1 Jarm. Wills (5th Am. Ed.) p. 290. As early as 1775 the king's
bench, in Bibb v. Thomas, 2 Wm. Bl. 1043, held that, if any of the
methods provided by the statute of frauds (29 Car. II, c. 3, § 6) for
the revocation of a will is performed in the slightest manner, this,
joined with the declared intent, will be a good revocation. In Hobbs
v. Knight, 1 Curt. Ecc. 768, a will was propounded with the tes-
tator's signature cut out. The prerogative court of Canterbury,
per Sir Herbert Jenner, after observing that the signature of the tes-
tator is so necessary to the validity of a will that the will cannot ex-
ist without it, held that the excision of the signature amounted to a
revocation. This was in 1838, after the new statute, in which the
words "canceling and obliterating" had been omitted and "otherwise
destroying" introduced instead. It has frequently been held that,
where a will is found among the testator's papers with the seal torn
off, the will was thereby revoked (Davies v. Davies, 1 Lee, Ecc. 444;
Lambell v. Lambell, 3 Hagg. Ecc. 568); even where a seal was not
essential to the will (Price v. Powell, 3 Hurl. & N. 341; Avery v.
Pixley, 4 Mass. 460). In the case of Dan v. Brown, 4 Cow. 483, 15
Am. Dec. 395, the court say:

"Revocation is an act of the mind, which must be demonstrated by some
outward and visible sign of revocation. The statute has prescribed four.
If any of them are performed in the slightest manner, joined with a declared
intention to revoke, it will be an effectual revocation,"—

Citing Bibb v. Thomas, supra. In re Philp (Sup.) 19 N. Y. Supp.
13, was an appeal from a decree of the surrogate of New York
county, refusing to admit to probate a writing alleged to be a will,
on the ground that the same had been canceled during the lifetime
of the decedent. The will was found in a safe the door of which
was open during business hours, and when found lines had been
drawn through the signature. The general term of the First depart-
ment held that there was a presumption of revocation, and that in
the absence of evidence of improper treatment of the will, or to
explain the canceling lines, the surrogate properly refused probate.
I think this case should be controlling in the case at bar. An ex-
haustive review of the authorities on this subject is found. In re
Clark's Will, 1 Tuck. 445, where upon the death of the testatrix her
will, duly executed, was found in her bureau drawer, with her sig-
nature and that of a legatee canceled. The surrogate of New York

county, after citing many cases, gives the following review, which is altogether appropriate to our present discussion (page 460):

"There is an absolute uniformity in these cases. They all hold to the doctrine of legal presumption where the will is found mutilated in the possession of the decedent, or has disappeared after being last traced to his possession. It is nowhere held that the contestant, the party opposing probate, must account for the mutilation or disappearance of the instrument, or must show such injury to have been the act of the decedent."

Turning now to the case at bar, the inquiry naturally arises, how did the proponent rebut the presumption of revocation? Principally, I think, by introducing evidence which should never have been admitted, to wit, testimony of many witnesses as to declarations made by the testator regarding his testamentary intentions, and the opinion of Mr. Carvalho, a handwriting expert, to the effect that the testator did not make the cancellation marks.

The first class of evidence was afterward stricken out by the surrogate, upon the authority of In re Kennedy's Will, 167 N. Y. 163, 60 N. E. 442, but he clearly placed much reliance upon the testimony of the handwriting expert. There was no question of disputed handwriting under chapter 36 of the Laws of 1880 and chapter 555 of the Laws of 1888. By "writing," the legislature intended to include only what is ordinarily and naturally understood to be such, e. g.:

"(1) The act or art of tracing or inscribing on a surface letters or ideographs. (2) The characters so made, collectively, especially with regard to shape or style. (3) Anything written or expressed in letters. (4) Law. A written instrument; words or characters that stand for words or ideas." Stand. Dict.

The admission of this testimony is but another instance of the abuse of expert evidence. So notorious is it becoming that, if it is not checked, it seems to me that a reaction must eventually come that will abolish such testimony altogether. Many years ago, Lord Campbell saw the danger from this source, when, in the Tracy Peerage Case, 10 Clark & F. 191, he said: "Hardly any weight is to be given to the evidence of what are called scientific witnesses; they come with a bias on their minds to support the cause in which they are embarked." In my opinion, the admission of the testimony of the handwriting expert was necessarily prejudicial to the contestant, and constituted reversible error.

Aside from the testimony above referred to, the only evidence which in any way tends to rebut the presumption of revocation is that, before the will was found in the testator's desk, that desk had twice been searched for it. These searches were made by Mr. Warren, a business associate of the decedent, who had a desk in the same office with Mr. Hopkins, and they were made in the presence of the widow and her brother, Mr. Chambers. Referring to the first search, Mr. Warren testifies: "Then I went to his (testator's) desk and made quite a thorough search throughout the desk without disturbing the papers that were there, and failed to find the will." Of the second search he testifies: "They (Mrs. Hopkins and her brother) requested me to go through the papers again in the office very carefully. I went through them." Some of the papers he laid in Mrs. Hopkins' lap; some he

laid in piles; but it nowhere appears that the papers were returned to the identical drawers from which they had been taken. Continuing, he says: "I thought that I looked through that desk very thoroughly, and did not find the will." Who has not, more than once, searched a desk or other receptacle several times before finding the desired object in a place already supposed to have been very carefully examined? A few hours later, going to the same desk for a check book, Mr. Warren, without apparent reason, opened one of the small drawers of the desk, and at once noticed the will in the same condition as it afterward appeared when offered for probate by the widow. There is no suspicion that any of those present while the second search was going on surreptitiously slipped the will into the drawer in which it was found soon after, nor is there a scintilla of evidence that any other person then or at any other time did so. I cannot believe that the fact that two fruitless searches were made before the discovery of the will is sufficient to rebut the presumption of revocation arising from its discovery where and in the condition in which it was found. The fact that the signature to the will was written in a trembling hand, while the canceling pen strokes were made in a decided manner, does not tend to rebut the presumption of revocation. During the 10 years following the tremulous signature, and up to the time of his death, the testator continued in the possession of all his faculties, and conducted business interests of considerable magnitude. He signed many bank checks, and the testimony shows that no difficulty was ever experienced in reading them. Certainly the evidence does not show that the hand with which he was accustomed to write was palsied or in any way incapacitated to such an extent as to prevent him from making the crude strokes which cancel his signature on the will. If it had been, it is almost certain that he would have delegated the power to sign his checks, but the testimony of his bank president shows that he did not do this. Indeed, so simple in character, so easy of execution, are these strokes, being nothing more than 14 slightly prolonged, downward jabs with a well-filled pen, that I am convinced that the testator could have made them with either hand, even though he were far from being ambidextrous.

So far as the evidence shows, the only person who will profit by the revocation of the will is the infant son, who was about 13 years of age at the time of his father's death. It is inconceivable that he was concerned in a fraudulent destruction of the will, and it is not suggested that any one was so interested in his behalf. The widow would take very much more under the will than otherwise. When the will was executed the son, who bore his father's name, was but 3 years of age. Before he died, the testator gave largely to all the churches of Tarrytown, to Pompey, the town of his birth, and to other institutions and places, and rendered financial assistance to distant relatives. After all this beneficence, is it strange that he should finally decide to let the law take its course, and thus to allow the bulk of his property to pass to his only child, Robert E. Hopkins, Jr., then growing into manhood? If he did so decide, then, to carry out his intention, the law required no more than that he should cancel the signature to his will with the intent to revoke it. And we cannot presume that he did

not know the law. The extent to which the learned surrogate was misled is evident from the following sentence taken from his opinion:

"I find no authority going to the extent of holding that where a will floats into the surrogate's office from an unknown source, or is found in the possession of strangers with the signature canceled or obliterated, without other evidence, that there is any presumption that the destruction or cancellation was by the hand of the testator."

Undoubtedly, there is no presumption of revocation in such a fancied situation, but the facts are there given antithetically. Large estates, and the overweening cupidity of individuals and institutions whose interests the testators when revoking their wills were so careless as not to consult, seem the only explanation for much of this sort of litigation, which has found too much encouragement in probate courts. The presiding justice seems to assume that an intelligent man, who has once executed a carefully drawn will, does an extraordinary thing if he ever cancels it,—"not," says he, "in the presence of witnesses, nor with the formalities provided by statute; and that, without making a new will or leaving any written explanation." Witnesses are not required when the canceling is done by the testator with his own hand, nor are any formalities provided by the statute in such case. See the statute, supra. No obligation, legal or moral, rests upon one who has revoked his will, either to execute another or to leave any written explanation. The statutes of descent and distribution have long and properly been relied upon in such cases. In regarding as a final act the execution of the will 10 years before the death of the deceased, my learned associate appears again to forget that a will is always ambulatory until the death of the testator. Dodge v. Cornelius, 168 N. Y. 242, 61 N. E. 244. After stating that the only evidence on the subject of revocation by cancellation "is such as may be inferred from the production of the will itself with the canceled signature," he declares that "all the probabilities derived from the circumstances" are against revocation, but probabilities will not prevail against presumptions of law. The probabilities he sets forth are: First, the execution of a suitable will; second, its existence for 10 years; and, third, its production before the surrogate without any change except the canceling marks. The first two do not appeal to me, while in the third I see something more than a probability of revocation. In re Philp, supra. There are in this case no circumstances indicating fraud, nor is the finger of suspicion pointed toward any one concerned in it, yet, if we affirm the decree of the surrogate, we, in effect at least, presume fraud, which is generally matter of proof. The language of the vice chancellor, in the case of Wynn v. Heveningham, 1 Colly. 630, a case of revocation by cancellation, seems peculiarly appropriate in the present case. He says:

"The next remark, whatever may be its weight, is of a nature sufficiently obvious, namely, that the admitted circumstances, the absence of any proved misconduct and of any suspicious conduct on the part of any person in particular, and the absence of any slur upon the reputation of any one person concerned, render the alleged fact, that the lines were made after her execution of the will neither by herself nor in her presence, one of an improbable kind."

"He who seeks to establish a lost or destroyed will," say the court, in Collyer v. Collyer, 110 N. Y. 481, 486, 18 N. E. 110, 112, 6 Am. St. Rep. 405, "assumes the burden of overcoming this presumption (of revocation) by adequate proof. It is not sufficient for him to show that persons interested to establish intestacy had an opportunity to destroy the will. He must go further and show, by facts and circumstances, that the will was actually, fraudulently destroyed." If evidence is insufficient to overcome the presumption of revocation when it shows that persons who will profit by the intestacy have had opportunity fraudulently to destroy a will, how much more inadequate is the proof of the proponent in the case at bar, where the only person interested to establish intestacy could not have been more than 13 years of age at the time of the alleged fraudulent cancellation. In the case last cited, the court of appeals also approved Loxley v. Jackson, 3 Phillim. Ecc. 126, a case of presumed revocation, where it was held that the law did not presume fraud, and that the burden of proof was on the party claiming under the will. It is true that, if the will is allowed to stand, many deserving interests may be benefited and much good accomplished; and if probate is denied the son, upon reaching maturity, may dissipate the large share of the estate, which in that event he will receive. But these are considerations which have nothing to do with the case, and should not be allowed to lead us from well-established precedents which form an unbroken line of authority.

I think the decree of the surrogate should be reversed.

JENKS, J., concurs.