H. T. Kellogg, Acting P. J.:
Margaret Crouse, now deceased, whose will forms the subject of this controversy, resided at Richfield Springs, N. Y. She was elderly and unmarried. Her nearest relative was an uncle, Menzo Crouse, who resided at Fort Plain, N. Y., and was more than ninety years of age. Other relatives were cousins to the number of thirty, scattered about the country from Minneapolis to New York city. No relative lived a less distance from Richfield Springs than twenty miles. So far as known, no relative, except Clara Tilton, a cousin, ever saw Margaret Crouse or ever was seen by her. Margaret Crouse possessed personalty of the value of $50,000 and real estate of the value of $25,000. If she has died intestate Menzo Crouse will receive the former, while he and the thirty cousins will divide the latter.
On April 10, 1920, Margaret Crouse executed before witnesses an instrument declared by her to be her last will and testament. In the dispositions thereby made the testatrix ignored all relatives except George Crouse Cook, a cousin who lived in New York city. To him she gave her paintings and silverware and nothing more. To John Passey, described by her to have been “ for many years my employee,” she gave certain furniture and a runabout car. She also made provision for the payment to him during fife of an annuity of $520. She further provided for his burial expenses, the purchase of a cemetery lot for him and the erection of a tombstone. She also provided that in case he became ill or infirm additional necessary sums might be spent by her trustees for his support. All the rest, residue and remainder of her property she gave, after the death of John Passey, to the “New York Branch of the Woman’s Foreign Missionary Society ” and the “ Woman’s Home Missionary Society ” of the Methodist Episcopal Church, to be equally divided between them.
Margaret Crouse became ill early in February, 1921, some ten months after making the will referred to. On Tuesday, the 15th day of February, 1921, she was taken to Htica where she entered the Faxton Hospital for care and treatment. On Wednesday, February 16, 1921, at about nine in the evening, she died. She had brought to the hospital with her a dress suit case. The dress suit case was locked and the key was not to be found. On Wednesday afternoon, the afternoon before her death, the superintendent of the hospital, Pearl Stout, opened the dress suit case. She found therein a package of papers consisting of valuable securities and other documents. Among them was a long, sealed envelope upon which there appeared the legends “ Last Will <fc Testament of Margaret Crouse,” “ Executor J. D. Reed,” and. *137 “ April 10th, 1920.” The superintendent placed the package in the hospital safe. On Saturday, February nineteenth, Clara Tilton called at the hospital and demanded possession of all the papers of her cousin Margaret Crouse. After consultation with J. D. Reed, the person named upon the envelope as executor, the superintendent delivered to her all the papers as well as the dress suit case and contents. Clara Tilton took them that night to her home in Palatine Bridge. On the following Monday, February twenty-first, she delivered the long envelope to J. D. Reed, who had called at her home therefor. The end of the envelope had then been cut or slit so that its contents could be removed. J. D. Reed took therefrom a paper which proved to be the will executed by Margaret Crouse in the previous April. On examination of the document it appeared that the signature of the testatrix had been cut therefrom. The cut was in the body of the will above the attestation clause. It had been carefully made so as to remove only that portion of the paper which bore the signature and to leave a narrow open space where the signature had been. The document was subsequently offered for probate in the Surrogate’s Court- of Otsego county. That court, after a hearing, refused probate on the ground that Margaret Crouse, the testatrix, had herself mutilated the document with intent to make revocation of the testamentary provisions therein contained.
The record discloses proof that the envelope containing the will had been cut or slit after it had been delivered to Clara Tilton.
The superintendent of the hospital, Pearl Stout, testified that, after she had taken the package of papers from the dress suit case and before she had placed them in the hospital safe, she had carefully gone over them one by one, making a mental note of each document therein contained. She said that when Clara Tilton on Saturday morning demanded the papers she declined to give them up unless the consent of J. D. Reed were first obtained. She stated that she then went to the telephone booth to telephone J. D. Reed and took with her the package of papers. She separated from the papers the envelope in question in order to read the legends thereupon appearing, and to refresh her recollection as to Reed’s initials. She testified that she held the particular envelope in her hand while she talked over the telephone. J. D. Reed was not then at his office and could not then be reached, so the witness restored the papers to the safe. Later in the day the witness again took the papers from the safe and carried them to the telephone booth. She kept them with her in the booth while she talked with J. D. Reed. The following testimony was given by her: Q. As I understand, you had exhibit B in your hands three *138 times, on three separate occasions, and separate and apart from the other package of papers, is that not correct? A. Yes.” On direct examination she testified that she did not observe that the end of the envelope was open. On cross examination she gave the following testimony: “ Q. Did you see that it was not open? A. I didn’t examine the end of it to see absolutely whether it was open or not. Q. You could not testify whether it was open or not? Is that right? A. I didn’t take it up and examine it to see' whether it was open or not. Q. You could not tell, you could not swear now, whether it was open on the end or not? A. I had it in my hand. Q. I am reading from the statement, I cannot state whether it was open on the end or not, is that true? A. It depends on how you want me to tell, I didn’t examine the end to see whether it was open, but I don’t say it was open. Q. You don’t say it was not? A. No. Q. So far as you know, it might * have been open at the end? A. I would not say that. Q. If you don’t know, how can you tell? A. I had it in my hands.” The reluctance of the witness to concede that the envelope may then have been open indicates that, while too conscientious to swear positively that it was unopened, she nevertheless received at the time a distinct and positive impression that such was the case.
The testimony of Pearl Stout was corroborated by that of Clara L. Overocker, the hospital bookkeeper. On Thursday morning, the morning after the death of Margaret Crouse, this witness had a conversation with J. D. Reed over the telephone. Reed stated that he had drawn a will for Margaret Crouse and asked the witness to see if it was among her papers. The witness went to the hospital safe, got the package of papers and took them to the telephone booth. She was asked and answered as follows:
“ Did you take it in your hand, the paper, the envelope, which you took out of the safe, from which you read to him on the telephone certain information? A. I did.” She recalled seeing upon the envelope the name of Reed, and “ Last Will and Testament of Margaret Crouse.” She gave the following testimony: “ Q. What did you say to Mr. Reed as to whether or not you could tell him there was a will in that envelope? * * * A. I told him I didn’t know, for the envelope was sealed.” She testified that she did not notice that the end of the envelope was open. The witness J. D. Reed corroborated her testimony. He stated that she said that the envelope was sealed and “ she didn’t dare open it.” Here was a witness, then, who was called upon by the executor and draftsman of the will to find out if the will still existed, who had the envelope in her hand, who noticed that it was sealed and who stated that because it was sealed she had not *139 the courage to open it. Her attention, therefore, was directly called to the question whether or not it was possible to take the will from the envelope without breaking the seal or otherwise mutilating the envelope. Under such circumstances her testimony that she did not notice that the envelope was open at the end was of great significance.
Clara Tilton testified that when she arrived at her home on Saturday evening, after her visit to the hospital, she placed the package of papers, obtained from the hospital superintendent, upon her dining-room table; that her husband, George F. Tilton, was present; that he said: “ Let me see if Mr. Reed’s name is on the outside of this envelope; ” that she told him not to touch the papers. Her precise words were: “ I says don’t touch them, but he pulled it out and as he did so he said ‘ Why the will is open,’ that is what he said.” George H. Tilton himself testified that he pulled out the will from the package of papers and that as he pulled it out he found that the end of the envelope was open. The witness B. F. Spraker testified that he attended at the Tilton home on that Saturday and took the will from the package of papers. He said: “ As I looked at the superscription on the envelope, on the right hand end, it had been cut open.” Thus we have the fact that these two witnesses when first they touched the envelope immediately observed that it was open at the end. On the other hand, we have the fact that Clara L. Overocker had previously examined the envelope with such care that she was enabled to read the legends thereupon and to observe that the contents of the envelope could not be removed therefrom because the envelope was sealed. We have the further fact that Pearl Stout, the hospital superintendent, had thrice examined the envelope and three times had held it in her hands separate and apart from the other papers. Neither of these witnesses observed that the envelope was open at the end. That it was not observable to the latter witnesses, and did become instantly observable to the former witnesses, finds ready explanation in the fact that the latter examined the envelope before, and the former examined the envelope after, the envelope had come into the possession of Clara Tilton.
The present physical condition of the envelope is in itself significant. The upper edge presents a straight line except near the right-hand corner. There it bends slightly downward. The right-hand or open end presents a line which is unvaryingly straight. On the upper edge, where the line bends down, the paper fibres, examined under a microscope, are short and of even length. On the right-hand end the fibres are long and hairy but of uneven length. From these facts it may well be inferred that some one *140 removed with scissors the veriest sliver of paper from the upper edge; that she then inserted a knife or pin in the opening made; that she then slit open the paper on the right-hand end. In any event it is self-evident that the actor took every precaution to conceal her work. Margaret Crouse had no motive for concealment. If she opened the envelope she did so to remove and destroy her will. If one, having the absolute right, sets about to destroy a will, her motive is to make the destruction obvious, not to hide it. On the other hand, Clara Tilton had every reason to hide her work. She had seen the envelope held in the hand-of the superintendent of the hospital. If she tore off the end, or if she tore the envelope and will in two, the superintendent would be able to give positive testimony that it was not in that condition when it left her hands. It was necessary, therefore, that she act with the utmost care in order that the subsequent condition of the envelope might as nearly as possible simúlate its former condition and the danger of the superintendent’s testimony might be averted. The condition of the paper itself, therefore, indicates that Clara Tilton, not Margaret Crouse, opened the envelope.
It is true that Clara Tilton testified that the envelope was in the same condition when she delivered it to J. D. Reed as it had been when she received it from the hospital superintendent, and that she did not herself open the envelope or see it opened. We do not think that Clara Tilton was a credible witness. In the first place, she was testifying to relieve herself of a serious charge which was criminal in its nature. In the second place, she was financially interested in the result which she sought to bring about. Moreover, her entire conduct in reference to the will marks her with suspicion. When she was at the hospital on the night that Margaret Crouse died she learned that there was a will of which J. D. Reed was executor. She then demanded possession of all the papers of the deceased. She returned home and took counsel of her lawyer. She went to Fort Plain and extracted from Menzo Crouse, the nearest of kin, an order for the papers wherein he stated that “ so far as he was concerned ” she might have them. She returned on Saturday for the papers to the city of Utica, forty miles away, thereby missing the funeral of Margaret Crouse. When there she demanded and pressed the superintendent for the papers and finally obtained them. From then until Monday she had possession of the will. Her husband opened it and observed that the signature was cut therefrom. Notwithstanding, Clara Tilton made the unbelievable assertion that neither she nor her husband ever read the will to learn its provisions. No innocent explanation of her extraordinary activity and excessive zeal in the matter of *141 obtaining possession of the will and other papers is apparent. Certainly they are not explained by any fear on her part that the papers left" at the hospital would be insecure. She herself denied that she entertained that fear. She said: “ Q. Didn’t you believe that was a safe place for them? * * * A. Why sure, that is what safes are for, I suppose. Q. Would they have been any safer in your possession than they were right there in the hospital? * * * A. Well, I don’t know as they would, but they were just as safe.” Yet possession of the will, though not for safekeeping, was of paramount importance to Clara Tilton. Can there be any doubt that she intended to examine the will, and, if Margaret Crouse had left her nothing, to act in some manner to accomplish its destruction? Her subsequent conduct was a confession of guilt. On the day after she delivered the will and envelope to the executor she hurried off to Utica again for an interview with the hospital superintendent. According to her own testimony she said to the superintendent: “ When I came in I says, ‘ I am back again.’ I says ‘ did you know the will was open when you gave it to me,’ and she says 1 no; ’ I says, ‘ well it was and her signature cut out, that puts me in a nice position, and I was so in hopes you saw it.’ ” We think that the testimony of this witness is not to be believed and that the clear weight of the proof establishes that the envelope containing the will was unopened when delivered to Clara Tilton, and was subsequently opened by her.
The proposition that Clara Tilton opened the envelope naturally leads to the conclusion that she cut the signature from the will. The envelope in proof has been cut open but once. If Margaret Crouse cut out the signature then the envelope in proof, if it be the envelope originally used, must at first have remained unsealed. After replacing the will in the envelope Margaret Crouse must then have sealed it. In other words, she was indifferent to sealing up a valid will but extremely careful to seal up a destroyed will. If a different envelope were originally used then Margaret Crouse, after destroying the will, must have placed it in the present envelope and not only sealed the envelope but written thereupon “Last Will and Testament of Margaret Crouse.” Either theory is chimerical. Clearly she who opened the envelope is the person who mutilated the will. Even if this were not so a finding that Clara Tilton opened the envelope would be a finding that Clara Tilton perjured herself, and so all the proof relied upon to establish a revocation would disappear.
That the burden of proving revocation fell upon the contestants seems clear. The statute law provides that the revocation of a will may be accomplished only by the performance of certain acts *142 which are therein specified. It may be accomplished by the execution of a new writing wherein the testator declares his purpose to revoke, or by a new will, in either of which cases all the formalities required for the making of a will must be observed. If the will be “ burnt, torn, canceled, obliterated or destroyed,” by the testator himself, with intent to revoke, there is a revocation. If these acts are performed by another person than the testator in his presence and under his direction and by his consent the revocation can be established only by the testimony of two witnesses showing the fact and the direction and consent of the testator. (Decedent Estate Law, §§ 21, 34.) Revocation, therefore, is an affirmative act which, like any other positive act, must be proven by those who assert it. In all but one instance, viz., destruction or mutilation by the testator himself, the fact is as difficult to prove as the making of a will. It necessarily follows, therefore, that in every instance there is a prima facie presumption that a testamentary disposition once made, or a testamentary intent once entertained, continues until the contrary is shown.
It is true that, in the case of a will destroyed while in the possession of a testator, or in the case of the production of a mutilated will known to have been taken in that condition from the papers of a deceased testator, an inference arises that the testator himself destroyed or mutilated his will with intent to revoke it. (Betts v. Jackson, 6 Wend. 173; Matter of Kennedy, 167 N. Y. 163.) The inference results from the fact that ordinarily access to a will and opportunity to destroy it are available only to the testator himself. The inference is evidence “ to the contrary ” which overrides the presumption of continuance. But where the facts are not similar to those related, so that the inference does not arise, then the original presumption prevails. (Matter of Hopkins, 73 App. Div. 559.) In that case access to a deceased testator’s papers had been had by unknown persons and his will removed from his desk. When later the will was found in the desk it was in a .mutilated condition. It was held that the inference of destruction by the testator did not arise, and probate of the will was approved.
Discarding the testimony of Clara Tilton, we have, in our case, no facts upon which an inference of revocation by the testatrix can be predicated. Clara Tilton alone gave proof that the will came from the possession of the testatrix, or was taken from her papers after her death in a mutilated condition. The proof then stands that the will was produced, after the death of the testatrix, from the possession of a stranger, and was then, for the first time, discovered to be in a mutilated condition. The presumption that *143 the testamentary disposition continued is, therefore, unimpaired by any inference or presumption to the contrary.
That Margaret Crouse did not intend to revoke her will is in accord with the probabilities. Margaret Crouse made her will on April 10, 1920. She carefully preserved it in a sealed envelope bearing the legend “ Last Will & Testament of Margaret Crouse ” until her death ten months later on February 16, 1921. It was found among valuable securities in a locked dress suit case which she carried with her to the Utica Hospital on the day before her death. The mil was not torn, and the envelope containing it was not cut or mutilated. John Passey, one of the beneficiaries of the will for reasons of faithful service, remained in the employ of Margaret Crouse at the time of her death, and doubtless continued to be an object of her solicitude. Revocation of the will would have left him penniless. The will gave the bulk of the property to missionary societies of the Methodist Episcopal church. There is no reason to suppose that the interest of Margaret Crouse in the Methodist church or its societies had suffered abatement. No reason wras suggested for a change of purpose and an intestacy which would result in a scattering of the property among a horde of unknown relatives. No proof was offered to show that any relative or set of relatives had newly engaged the affections of the testatrix. So far as known they remained strangers to all her interests and desires. We think the presumption of a continued testamentary intent is strengthened rather than weakened by the proof.
For all these reasons the decree of the surrogate should be reversed, with costs, and a decree entered directing the probate of the will.
Van Kirk, Hinman and Hasbrouck, JJ., concur; Kiley, J., concurs in reversal on the ground of errors committed upon the trial, and votes for a new trial.
Decree of the Surrogate’s Court of Otsego county refusing probate reversed upon the law and facts, with costs to the appellants payable out of the estate, and matter remitted to said court, with directions to admit the will to probate, with costs to the appellants payable out .of the estate. The court disapproves of the finding that the testatrix revoked her will; and finds that the will as executed by the testatrix has never been revoked, and is the last will and testament of Margaret Crouse.